438

City of Pittsburgh, a municipal corporation, Appellant *v.* Sanford B. Gold, Manuel Gold and Marvin H. Levick, Appellees.

Sanford B. Gold, Manuel Gold and Marvin H. Levick, Appellants *v.* City of Pittsburgh, a municipal corporation, Appellee.

Argued May 5, 1978, before Judges Mencer, Rogers and DiSalle, sitting as a panel of three.

*D. R. Pellegrini,* Assistant City Solicitor, with him *Mead J. Mulvihill, Jr.,* City Solicitor, for City of Pittsburgh.

*Leonard M. Mendelson,* with him *William R. Grove, Jr.,* and *Hollinshead & Mendelson,* for Sanford B. Gold, et al.

OPINION BY JUDGE MENCER, September 1, 1978:

We have for determination cross appeals by the City of Pittsburgh (City) and Sanford B. Gold, Manuel Gold, and Marvin H. Levick (property owners) from an order of the Court of Common Pleas of Allegheny County which dismissed the exceptions filed by the City and the property owners to a nonjury verdict awarding $73,350 as just compensation for condemnation damages.

The City, on May 26, 1971, filed a declaration of taking for a strip of land 10 feet wide and 110 feet long for the installation of a sewer. This strip of land was the 10-foot walkway from Dawson Street to the rear alleyway located between two apartment buildings owned by the property owners. Preliminary objections

to the declaration of taking were filed by the property owners, alleging that the taking was excessive in that it condemned in fee simple for sewer purposes and should only have condemned an easement. On December 14, 1972, the trial court sustained the preliminary objections, following which action the City amended its declaration of taking on January 29, 1973 to take an easement, rather than a fee simple, for the sewer installation.

However, during the pendency of these legal proceedings, the installation of the sewer had been completed in September of 1971, and thereafter but prior to the filing of the amended declaration of taking, the property owners made repairs and improvements to the two apartment buildings. In 1975, these buildings became subject to cracks in the foundations, doors sticking, and windows cracking.[1] Inspections were made by the City's Bureau of Building Inspection which thereafter sent the property owners a notice of various building code violations, with directions to submit an engineering report as to the stability of the buildings.

The property owners engaged a soil engineer and a structural engineer, who determined that the buildings were undermined by the "piping" action of water underneath the foundation slabs and recommended that the building at 3732 Dawson Street be demolished and suggested repairs be made to the building at 3728 Dawson Street. The building at 3732 Dawson Street was demolished because the property owners concluded

---

[1] On April 17, 1975, the board of viewers filed its report and made an award in favor of the property owners in the amount of $1000. The property owners appealed to the Court of Common Pleas of Allegheny County, and after a nonjury trial, a verdict was returned on March 21, 1977 in favor of the property owners, in the amount of $73,350.

that it would be financially unfeasible to rehabilitate this building and the failure to do so would subject them to prosecution for building code violations. Since the nonjury trial in the court below, the building at 3728 Dawson Street has been vacated due to structural instability.

The trial court, in awarding damages, ascertained damages as of May 26, 1971, the date of the original filing of the declaration of taking, without giving consideration to the remodeling and improvements to the buildings made by the property owners after that date but before the structural problems became apparent in 1975 and before the amended declaration was filed on January 29, 1973.

The City contends that we should reverse the trial court's order dismissing exceptions for the following reasons: (1) The property owners failed to file preliminary objections asserting that the City was taking more than it purported to take by its declaration of taking, (2) the damages to the property owners' buildings were cognizable in a trespass action rather than in eminent domain proceedings, (3) record evidence does not support the trial court's conclusion that damage to buildings was the direct, immediate, and unavoidable consequence of the City's eminent domain proceedings and its construction of the sewer, and (4) the property owners failed to mitigate their damages. The property owners appealed, contending that the trial court should have considered repairs and improvements made to the buildings between the date of the filing of the declaration of taking and the date of the filing of the amended declaration of taking in ascertaining the just compensation to which they were entitled. We will consider these contentions seriatim.

Property owners failed to file preliminary objections asserting that the City

was taking more than it purported to take
by its declaration of taking.

The City contends that the property owners are claiming a de facto taking for damages to their buildings which are located off the strip of property condemned and their failure to file preliminary objections to the declaration of taking precludes their recovery here under our holding in *Nelis v. Redevelopment Authority of Allegheny County,* 4 Pa. Commonwealth Ct. 533, 287 A.2d 880 (1972). In that case, we held that Nelis had waived his right to raise the issue of a de facto taking by having failed to petition for the appointment of a board of viewers pursuant to Section 502(e) of the Eminent Domain Code, Act of June 22, 1964, Special Sess., P.L. 84, *as amended* (Code), 26 P.S. §1-502(e), and by having failed to file preliminary objections to the declaration of taking, the exclusive method of challenging condemnation proceedings as provided by Section 406(a) of the Code, 26 P.S. §1-406(a).

The fatal defect in this contention by the City is that the property owners here do not assert a de facto taking of their property but rather that the damages which they suffered were the immediate and necessary consequence of the City's nontortious construction of a sewer in the exercise of its power of eminent domain on adjacent land. Article X, Section 4 of the Pennsylvania Constitution[2] provides recovery by an owner for

---

[2] Article XVI, Section 8 of the Constitution of 1874 formerly covered the same subject matter. Article X, Section 4 of the Pennsylvania Constitution reads:

Municipal and other corporations invested with the privilege of taking private property for public use shall make just compensation for property taken, injured or destroyed by the construction or enlargement of their works, highways or improvements and compensation shall be paid or secured before the taking, injury or destruction.

the injury or destruction of his property by a municipality for a public use even where there is no taking and where neither negligence nor nuisance occasioned the injury. *See Hastings Appeal,* 374 Pa. 120, 97 A.2d 11 (1953); *Fyfe v. Turtle Creek Borough,* 22 Pa. Superior Ct. 292 (1903).

Even if we would concede for purpose of argument that the facts of this case resulted in a de facto taking, we would be in accord with the trial court's reasoning which was stated as follows:

It is obvious in the sequence of events that damage which occurred to the property as a result of the condemnation activity became apparent two years *after* the Amended Declaration of Taking was filed, a period in excess of the 30-day rule for the filing of Preliminary Objections set forth by the Eminent Domain Code, Section 406 (26 P.S. §1-406). The construction of the sewer envisioned by the condemnation procedure had occurred nearly four years before the effects of said activity became evident to the plaintiffs. Accordingly, the defendant's exception on the grounds of failure to file preliminary objections is unwarranted. (Emphasis in original.)

The damage to the buildings not having surfaced until approximately 4 years after the City filed its declaration of taking is the factor which, in any event, would distinguish this case from our holding in *Nelis v. Redevelopment Authority of Allegheny County,* 12 Pa. Commonwealth Ct. 338, 315 A.2d 893 (1974), where the defacto taking occurred prior to the filing of a declaration of taking.

The damages to the property owners' buildings were cognizable in a trespass action rather than in eminent domain

proceedings and record evidence does not support conclusion reached by trial court.

An owner of property damaged as the immediate and necessary consequence of the nontortious construction of a sewer in an easement taken by eminent domain upon which the owner's property abuts is entitled to a board of view for the assessment of the damages. *Hastings Appeal,* supra. Of course, if the damage is not the immediate and necessary consequence of the municipal undertaking but flows, rather, from some tortious act, the injured party must proceed in trespass. *Stork v. City of Philadelphia,* 195 Pa. 101, 45 A. 678 (1900).

Here, the trial court determined that the property owners' damages were the immediate and direct consequence of the construction of the sewer. Further, the trial court concluded that there was no negligence on behalf of the City which constructed the sewer. It is true that the record does contain conflicting evidence on these questions, but it is the role of the trial court to resolve such conflicts of evidence. Our independent review of the record satisfies us that the record contains substantial evidence to support the trial court's findings and its determination that the property owners' damages were the immediate and direct consequence of the nontortious construction of the sewer.[3] Therefore, these eminent domain proceedings were appropriate under the facts of this case.

---

[3] The property owners introduced testimony of a Milan Spanovich, who is a consulting geotechnical engineer and who testified in part as follows:

BY MR. MENDELSON: Q. In your opinion, Mr. Spanovitch, was the movement of the buildings, to which you have referred, and the new or recent cracks to which you have referred, the direct, immediate, necessary and unadvoidable result of the action of the City of Pittsburgh in exercising its power of eminent domain for the construction

The property owners failed to mitigate their damages.

of the sewer? . . . [Objection to question overruled.] [A.] Yes. Simply it is the geomtry [sic] that is the problem, and I would say, yes.

BY MR. MENDELSON: Q. When you say it is the geomtry [sic] that is the problem, what do you mean? A. I mean that there is nothing wrong with the sewer installation. It is the standard installation. It is just where it was put that is the problem. And it happens to be put between two buildings, and happens to be severing an area where water is flowing. It happens to be encountering a residual soil that is impervious, and put in an ideal position to pack it into a sump. Structurally there is nothing wrong with it except the location between two buildings makes it a very bad one with respect to the location of the buildings. Q. Did you, in reaching your opinion as to the cause of the movement of the buildings and the consequent effects, eliminate other possible causes? A. Oh, yes. Q. Will you tell us how you went about doing that? A. There were several other causes. The first thing I considered was settlement; knowing that the buildings were considerably older than 50 years. Most of the settlement would have been terminated within ten, 15 years, certainly by 20 years after construction. There should be no reason for the settlements to continue unless some external force was applying to it. I found of no other external force. There were no new loads added. There were no new apartments added. There was nothing added to the structure that would increase the loads. There were no exceptional snow loads. So I eliminated accelerated settlements. The only thing I knew that had disturbed it was a shoring placed in for the construction of the sewer. But still to the degree of settlement, the kind of movements would have occurred right at the building itself, and not on the other side, and not the floor slab. The floor slab wouldn't have been affected at all. The second thing I looked at was mine subsidence. I evaluated to see if there was any mining. I looked into the coal picture, and I know of no mining in this vicinity. The closest mining I could find was up on Whitman Street, which was considerably higher in elevation than this. Therefore, the mine subsidence was eliminated. Another factor I considered was whether there had been an

446

The City cites a single case in support of its contention that the property owners here failed to mitigate their damages. The case cited is *Stuckemann v. City of Pittsburgh,* 255 Pa. 307, 99 A. 906 (1917), where a property owner had collected damages from the City of Pittsburgh in a board of viewers proceeding to compensate him for the cost of raising his house, in consequence of the change of grade of a street. He did not raise his property, and in consequence thereof, surface drainage leaked into his property, causing damages. Under these facts, the court directed a verdict for the City in an action to recover for water damages. We find this case to be inapposite to the question of damage mitigation. We read *Stuckemann* to hold that a property owner who has been given an award to enable him to raise his property to conform to the new grade and who fails to expend the money for this purpose does so at his risk and has no cause of action for harmful results therefrom.

---

earth mass movement, a landslide movement. And I looked around and saw no indication of landslide movements in the rear parking lot. There was no movements in the other buildings around it, down slope from it. But I still drilled the boring and wanted to make sure that there was no landslide at this point in movement. When I drilled the boring I found the residual soil was relatively shallow and that the foundation of the building very likely extended down to the residual soil. And there was no earth mass movement that would have included that without taking out the street and everything else. So those were the only three mechanisms which could have effected [*sic*] the structure. And the only thing I could find was the external forces produced by placing a sewer there. The hydrostatic forces, and then the cavitation that was occurring under the slab; the progressive movement that was effecting this. Q. And did all that confirm your conclusion that the movement of the buildings was caused by the installation of the sewer? A. That's correct.

We share the view of the trial court that "[t]here is no duty imposed by the Eminent Domain Code upon an injured property owner to mitigate [damages]." As we will next discuss, those damages are fixed as of the time of the condemnation.

> The trial court should have considered repairs and improvements made to the buildings between the date of the filing of the declaration of taking and the date of the filing of the amended declaration of taking in ascertaining the just compensation due the property owners.

Section 602(a) of the Code, 26 P.S. §1-602(a), reads:

> (a) Just compensation shall consist of the difference between the fair market value of the condemnee's entire property interest *immediately before* the condemnation and as unaffected thereby and the fair market value of his property interest remaining *immediately after* such condemnation and as affected thereby, and such other damages as are provided in this code. (Emphasis added.)

The condemnation here was effected by the filing of a declaration of taking on May 26, 1971. This was a condemnation of a fee simple which subsequently, by amendment of the declaration of taking, was reduced to a condemnation of an easement only. However, the amended declaration of taking was not a new condemnation but merely a modification and reduction of the property interest condemned.[4]

---

[4] We do not pass upon the appropriate date to determine damages under the Code in the converse situation, not presented here, of an amended declaration of taking which condemns a greater interest than condemned by the initial declaration of taking.

The trial court stated:

> The damages for the taking were fixed by the Court as of the date of the taking, May 26, 1971, and not as of the date of Amended Declaration of Taking. Although the facts of the case show that the plaintiffs sustained certain financial losses on account of the condemnation activity, that part which occurred after the 1971 Declaration of Taking is not compensable under the Eminent Domain Code. While this is a hard result upon the plaintiffs who expended money for repairs and improvements of the property after May 26, 1971, it is nonetheless the only result allowed by law.

However, in addition to just compensation for the condemnation of the strip of land 10 feet wide and 110 feet long on May 26, 1971, the trial court properly included in its award an amount for the structural damages to the buildings which were a direct and immediate result of the City's condemnation and subsequent sewer construction. The trial court, in reaching its verdict, considered what it had observed during its two views of the property. We find no reason to set aside the verdict rendered here.

Order affirmed.

### Order

Now, this 1st day of September, 1978, the order of the Court of Common Pleas of Allegheny County, dated September 9, 1977, dismissing the exceptions of the City of Pittsburgh to a nonjury verdict awarding $73,350 in favor of Sanford B. Gold, Manuel Gold, and Marvin H. Levick and against the City of Pittsburgh is hereby affirmed.

ORDER

Now, this 1st day of September, 1978, the order of the Court of Common Pleas of Allegheny County, dated September 9, 1977, dismissing the exceptions of Sanford B. Gold, Manuel Gold, and Marvin H. Levick to a nonjury verdict awarding $73,350 in favor of Sanford B. Gold, Manuel Gold, and Marvin H. Levick and against the City of Pittsburgh is hereby affirmed.